**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ACTION NISSAN, INC.,**

**Plaintiff,**

**v.** **Case No.: 6:24-cv-332-NWH**

**FORD MOTOR COMPANY and HYUNDAI MOTOR AMERICA CORPORATION,**

**Defendants.**
______________________________/

# ORDER

This matter is before the Court on six motions to exclude the testimony of five experts filed by Plaintiff Action Nissan, Inc. ("Plaintiff" or "Action Nissan"), Defendant Ford Motor Company ("Ford"), and Defendant Hyundai Motor America Corporation ("Hyundai"). The motions, responses, and replies are grouped as follows:

1) **Defendants' Motions to Exclude the Testimony of Plaintiff's Expert Edward M. Stockton (Docs. 255 (Hyundai) and 262 (Ford))** (collectively, the "Stockton Motions")

   a. Plaintiff's Response to Hyundai's Motion (Doc. 268) and Response to Ford's Motion (Doc. 270) (collectively, the "Stockton Responses")

   b. Ford's Reply to Plaintiff's Response (Doc. 301) (the "Stockton Reply")

2) **Defendants' Motions to Exclude the Testimony of Plaintiff's Expert Patrick L. Anderson (Docs. 256 (Hyundai) and 257 (Ford))** (collectively, the "Anderson Motions")

    a. Plaintiff's Response to Hyundai's Motion (Doc. 274) and Response to Ford's Motion (Doc. 275) (collectively, the "Anderson Responses")

3) **Plaintiff's Motion to Exclude the Testimony of Defendants' Expert Sharif Farhat (Doc. 260)** (the "Farhat Motion")

    a. Hyundai's Response (Doc. 272) and Ford's Response (Doc. 283) (collectively, the "Farhat Responses")

4) **Plaintiff's Motion to Exclude the Testimony of Defendants' Experts David Smith and Joseph Gardemal III (Doc. 261)** (the "Smith/Gardemal Motion")

    a. Hyundai's Response (Doc. 273) and Ford's Response (Doc. 284) (collectively, the "Smith/Gardemal Responses")

For the reasons discussed below, the Court will grant the Motions in part, deny them in part, and take them under consideration in part.

## BACKGROUND

Plaintiff Action Nissan (doing business as Universal Hyundai in Orlando, Florida) is an authorized dealer of Hyundai vehicles, pursuant to a Dealer Sales and Service agreement with Defendant Hyundai. (*See* Doc. 186-4).[1] This case is the most recent of three lawsuits between Plaintiff and Hyundai. Plaintiff first sued Hyundai in 2018 for breach of contract based on Hyundai's failure to honor Plaintiff's right of first refusal to open a Genesis dealership. *Action Nissan, Inc. et al. v. Hyundai Motor America et al.*, Case No. 6:18-cv-380-WWB-UAM. That case ended in a $16 million jury verdict in favor of Action Nissan and its CEO William Nero, Sr.

Action Nissan sued Hyundai again in 2021 in *Action Nissan, Inc. v. Hyundai Motor America Corporation et al.*, Case No. 6:21-cv-2152-WWB-NWH (hereinafter, the "Allocation Case" or "Allocation Action"). Action Nissan alleged in the Allocation Case that Hyundai failed to allocate sufficient inventory to Universal Hyundai, which caused its sales performance, ranking, and profitability to decline. That case also proceeded to trial and resulted in a judgment in favor of Action Nissan based on the jury's finding that Hyundai violated Fla. Stat. § 320.64(18). *See* Allocation Case, Doc. 289. That statute prohibits, *inter alia*, a motor vehicle manufacturer from implementing a system of allocation or distribution of vehicles that is "unfair,

[1] Many of Plaintiff and Defendants' exhibits appear multiple times in the record before the Court under seal. For the sake of efficiency, the Court will cite only one document. The Court's citations refer to the CM/ECF document and page numbers.

inequitable, unreasonably discriminatory, or not supportable by reason and good cause. . . .” Fla. Stat. § 320.64(18)(e).

In January 2023, while the Allocation Action was pending, Action Nissan executed a contract with non-party Cocoa Ford, Inc. (doing business as Paradise Ford) to purchase a franchised Ford dealership (the “Asset Purchase Agreement”). (*See* Doc. 186-5). The Asset Purchase Agreement was subject to approval by Defendant Ford pursuant to Fla. Stat. § 320.643(1). (*See* Doc. 186-5 at 31).

Plaintiff and Cocoa Ford, Inc. promptly submitted the Asset Purchase Agreement to Ford. (*See* Doc. 186-6). Ford advised Plaintiff of its evaluation guidelines via a letter dated January 18, 2023. (Doc. 186-7). Therein, Ford summarized its “Four Cs” criteria—which considers a dealer-candidate’s character, capacity, customer satisfaction, and capital—and requested additional documents from Plaintiff. (*Id.*).

On February 9, 2023, Plaintiff submitted certain “manufacturer reports” to Ford. (Doc. 191-8). Included within those reports were Hyundai-branded “sales efficiency trend” graphs from 2020 to 2022 for Universal Hyundai. (*Id.* at 7-12). On March 2, 2023, Ford rejected the Asset Purchase Agreement on the purported ground that Action Nissan failed to meet Ford’s internal requirements for “Capacity”—*i.e.*, that Action Nissan failed to demonstrate “a history of acceptable profitability, car and truck sales performance, and parts and service operations compared with their respective manufacturer’s averages.” (Doc. 186-8).

In response to a letter from Action Nissan’s president contesting the denial, Ford explained that its rejection was based on the sales efficiency performance—which

is calculated based on a metric used by Hyundai (hereinafter, the "Sales Efficiency Score")—of Action Nissan's Universal Hyundai dealership. (Doc. 186-9, hereinafter the "Second Rejection Letter"). Specifically, the Second Rejection Letter explained: "The actual sales efficiency performance of your Hyundai store from the period of January 2021 through September 2022 ranged from a low of 48.7% to a maximum of 83.9%. This performance is well below the minimum acceptable capacity level for any potential buyer to be approved, for any Ford dealership." (*Id.*). As a result of Ford's rejection, Cocoa Ford, Inc. notified Action Nissan of its decision to terminate the Asset Purchase Agreement. (Doc. 186-10). The dealership was subsequently sold to another franchisee, which the Parties refer to as "SAG Cocoa," in 2023. (*See* Doc. 191-25 at 26).

After its purchase fell through, Plaintiff sued Hyundai and Ford, alleging one claim against Ford for violating Fla. Stat. § 320.643(1)(a), and two claims against Hyundai for violating Fla. Stat. §§ 320.64(42)(a)(1) and (a)(2). (Doc. 1). Plaintiff's Complaint seeks compensatory damages from both Defendants, a declaratory judgment that Hyundai's sales efficiency metric violates § 320.64(42)(a)(2) and that Ford's refusal to approve the sale violates § 320.643(1)(a), and an injunction prohibiting Hyundai from using the sales efficiency metric going forward. (*Id.*).

## STANDARD

Although opinion testimony is generally inadmissible, Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony in limited circumstances. (*Id.*). Expert opinion testimony is admissible if: (1) "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." (*Id.*).

"The Federal Rules of Evidence assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)) (citation modified). Pursuant to *Daubert*, the determination of admissibility is "uniquely entrusted to the district court," which is given "considerable leeway in the execution of its duty." *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting *Kumho Tire*, 526 U.S. at 152) (internal quotation marks omitted). However, "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n.10).

The Eleventh Circuit has distilled the test for determining the admissibility of expert testimony under Rule 702 and *Daubert* into three basic inquiries—(1) is the expert qualified; (2) is the expert's methodology reliable; and (3) will the testimony assist the trier of fact. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998).

## DISCUSSION

### I. Edward M. Stockton, M.S. (Plaintiff's Expert)

Plaintiff's expert Edward M. Stockton testified in the Allocation Case that Plaintiff received disadvantageous vehicle allocations from Hyundai between mid-2020 and 2022. (Doc. 255 at 3) (citations omitted). He opined that Hyundai's allocation was not explained by normal allocation principles because Plaintiff typically sold vehicles faster than its peers. (*Id.*). To reach those opinions, Mr. Stockton reviewed, analyzed, and conducted statistical analyses of the voluminous allocation data for Hyundai dealers in Florida (and in some circumstances, the larger southern region). (*Id.*) (citations omitted). His opinions in this action are largely (if not entirely) identical to those from the Allocation Case, and they are based on his statistical findings from the Allocation Case. (*See* Doc. 268 at 4, 8-11).

The rub here is that some of the data and analyses underlying Stockton's opinions was not separately disclosed in this case. Stockton included the following disclosure in his expert report dated November 3, 2025:

> I served as Universal's expert in its lawsuit against HMA that related to allocation practices. I am very familiar with the testimony, subject

> matter, and data from the case. Per instruction from counsel for Universal, I summarize the findings/opinions related to allocation that I intend to express, if appropriate, but withhold citations to testimony or the trial record while parties to this litigation address confidentiality issues. The following summarizes the substance of my testimony.

(Stockton Rpt., Doc. 263-1 at 45).

Hyundai moves to exclude Stockton's testimony on the allocation issue because he "never identifies the underlying dataset, never defines 'turn rate,' never states the calculation or time period, never identifies the peer group, never provides a table, and never explains how the record supports his conclusion that [Action Nissan] received disadvantageous allocation." (Doc. 255 at 6). Ford makes a similar argument in its Motion. (Doc. 262 at 6-8).

Plaintiff argues in its Responses that the underlying data is Hyundai's data, which was produced by Hyundai in the Allocation Case. Plaintiff asserts that data (as well as Stockton's related opinions) was not disclosed in this case because a confidentiality stipulation between Plaintiff and Hyundai designated the data as confidential and for use "only for purposes of [the Allocation Case.]" (Doc. 268 at 3-5). According to Plaintiff, Stockton's reports comply with Rule 26 because he expressly referred to his work in the Allocation Case, including the information underlying his opinions, his testimony in two depositions, and his trial testimony. (Doc. 270 at 7-8).

Plaintiff's rebuttal to Hyundai's Motion is well taken. That said, Ford was not a party to the Allocation Case, and it has (presumably) not seen the data disclosed therein. It appears that the Parties now dispute whether they reached an agreement regarding the discovery materials and trial testimony that could be used in this case.

The Parties should be prepared to address this issue at the Pretrial Conference. **Plaintiff shall ensure that Mr. Stockton is available to testify, either in person or remotely, at that hearing.**

## II. Patrick L. Anderson (Plaintiff's Expert)

Plaintiff's expert Patrick L. Anderson offers seven opinions, which generally relate to Plaintiff's damages in this case. Both Defendants move to disqualify Mr. Anderson on a variety of grounds. The Court will address each Motion in turn.

### *A. Hyundai's Motion to Exclude Anderson* (Doc. 256)

Hyundai first argues that Anderson's damage opinions should be excluded because, although he purports to assess the "fair market value" of the dealership at issue, he ignores the industry standard definition of fair market value: "the price exchanged in a market among multiple willing buyers and sellers with sufficient information and no compulsion." (Doc. 256 at 5-7). This argument, however, is untethered to the *Daubert* standard and analysis, which this Court is required to apply. Even accepting Hyundai's premise at face value, Anderson is not necessarily excludable solely because he ignores an "industry standard" methodology. The question is whether his opinion is based on sufficient facts and data and is the product of solid principles and methods reliably applied to the facts of the case. Fed. R. Evid. 702. This Court has already held that lost profits are the appropriate measure of Plaintiff's damages here. (Doc. 248 at 25-26 (citing *Aetna Life & Cas. Co. v. Little*, 384 So. 2d 213, 216 (Fla 4th DCA 1980) and *KMS Rest. Corp. v. Wendy's Int'l Inc.,* 194 F. App'x 591, 601-02 (11th Cir. 2006))). Whether Anderson is calculating lost profits, or

the market value of the business, is discussed in more detail below and will be addressed at the Pretrial Conference.

Hyundai's next argument is that Anderson's damages theory should be excluded because he does not rely on the actual profits of the dealership that existed both pre- and post-turndown. Anderson's valuation opinion is based instead on the hypothetical business that Plaintiff would have operated were it permitted to purchase the dealership at issue. Hyundai reasons that "Mr. Anderson's methodologies and opinions do not mesh with Plaintiff's damages theory. Mr. Anderson cannot possibly testify with respect to lost profit damages of an ongoing business operation when he valued a unique business that was never operational." (Doc. 256 at 10). Plaintiff counters that this argument conflates two distinct questions. (Doc. 274 at 5-7). The first question, which the Court has already answered, is whether Plaintiff can recover lost profits. (*See id.*). The second question is how Plaintiff may appropriately prove its lost profits. (*See id.*).

Hyundai's assertion that Anderson cannot rely on Plaintiff's projections while simultaneously ignoring data from the existing business is fertile ground for cross examination, but it says nothing about whether Mr. Anderson's testimony is admissible. *See, e.g., G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526, 1539 (11th Cir. 1985) ("While [lost profit] damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The proof may be indirect and it may include estimates based on assumptions, so long as the

assumptions rest on adequate data." (citation modified)) (collecting cases). Whether the data relied on by Mr. Anderson are adequate is another question. The Court will hear evidence and argument on that issue at the Pretrial Conference.

Hyundai's final argument is that Mr. Anderson's methodology is inconsistent and arbitrary in four ways: "First, he arbitrarily relies on SAG Cocoa's projections but not its earnings. Second, he credits the seven comparison dealers' earnings but not SAG Cocoa's. Third, he arbitrarily selects the "comparison" dealers. Fourth, he accepts projected profits while manually recreating projected expenses." (Doc. 256 at 11). Plaintiff's Response, on the other hand, discusses Anderson's bases for each of these claimed inconsistencies. (Doc. 274 at 7-9). The briefing on this issue is not sufficient for the Court to make determination, and as such, the Court will take the issue under advisement and hear additional argument and evidence at the Pretrial Conference. **Plaintiff shall ensure that Mr. Anderson is available to testify, either in person or remotely, at that hearing.**

*B. Ford's Motion to Exclude Anderson* (Doc. 257)

Ford's first argument is that Mr. Anderson cannot opine regarding causation, which Plaintiff appears to concede. (*See* Doc. 257 at 4; Doc. 275 at 5). In its response, Plaintiff avers that Anderson simply presumed liability for the purpose of calculating damages. (Doc. 275 at 5). To the extent Anderson intends to opine on causation, however, Ford's Motion is granted.

Ford's next argument is that Mr. Anderson performed a business valuation, not a lost profits calculation. (Doc. 257 at 4-6). Plaintiff does not dispute that lost profits

are the sole measure of damages. (*See* Doc. 275 at 3-5). It claims, however, that Mr. Anderson did calculate lost profits. (*Id.*).

Under Florida law, if a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss. *Polyglycoat Corp. v. Hirsch Distribs., Inc.,* 442 So. 2d 958, 960 (Fla. 4th DCA 1983). If the business is not completely destroyed, then lost profits "may be a proper item of damages." *Aetna Life & Cas. Co. v. Little*, 384 So. 2d 213, 216 (Fla. 4th DCA 1980). But a "business may not recover both lost profits and the market value of the business." *Montage Grp., Ltd. v. Athle-Tech Comput. Sys., Inc.*, 889 So. 2d 180, 193 (Fla. 2d DCA 2004). At summary judgment, the Court recognized that the dealership which Action Nissan sought to purchase has been continuously operated by either Cocoa Ford, Inc. or SAG Cocoa, LLC (as of July 31, 2023) and determined that "a reasonable jury could conclude that Ford's rejection resulted in Action Nissan's loss of the use of the dealership—and lost profit damages." (Doc. 248 at 25-26 (citing *Aetna Life & Cas. Co. v. Little*, 384 So. 2d 213, 216 (Fla 4th DCA 1980) and *KMS Rest. Corp. v. Wendy's Int'l Inc.,* 194 F. App'x 591, 601-02 (11th Cir. 2006))).

The Parties' arguments with respect to this issue are confusing.[2] Notably, there seems to be a fundamental disagreement about what Mr. Anderson actually did here. According to Ford, Anderson estimated the "value of the Ford dealership, under the

[2] The Parties insistence on sealing the expert reports and depositions, and their inconsistent (and sometimes inaccurate) citations to these documents render this task even more difficult.

'fair market value' standard—'the price a willing buyer would pay for a specific asset at a specific time'—as of a fixed 'valuation date' of May 1, 2023. His calculation is straightforward: a 'value of specific business' of $78.5 million, 'less' the $13.5 million 'goodwill payment,' 'equals' $65 million in damages." (Doc. 257 at 5 (citing Anderson Rpt., Doc. 258-1 at 37, 71, 73-74; Anderson Dep. Excerpts, Doc. 258-2 at 11, 14-15, 18)) (cleaned up). Plaintiff argues in response that Anderson used the "income approach," which is "based on the principle that the value of a business asset is equivalent to the expected future stream of income from that asset, discounted for time and risk" and that "[i]n this case the lost profits are the economic damages" and that he "looked at lost profits because that was the best way to do it." (Doc. 275 at 4 (citing Anderson Rpt., Doc. 258-1 at 71)) (cleaned up).

The market value of a business and its lost profits, while mutually exclusive remedies under Florida law, do not appear to be mutually exclusive concepts. The market value of a business on a specific date includes some measure of future profits. *See e.g., KMS Rest. Corp.*, 194 F. App'x at 602 (affirming district court's jury instruction that present market value may be used as a standard in determining the amount of lost profit damages). Indeed, "[t]he prohibition against the recovery of damages for both the value of a business and lost profits is based on the principle that a business's value reflects its future profits." *Montage Grp.*, 889 So. 2d at 199.

As a matter of common sense, a business that is completely destroyed suffers more harm that a business whose operations continue. As a result, Florida caselaw *restricts* continuing business to only the lost profits caused by the wrong—not to the

entire value of the business. During his deposition, Mr. Anderson testified: "it's my opinion that those lost profits that they would have earned is equivalent to the market value of the business to the extent . . . there was one theoretically at the moment that [Action Nissan] took over control of this dealership." (Anderson Dep. Excerpts, Doc. 258-2 at 19; *see id. iat* 11-12, 17; Anderson Rpt., Doc. 258-1 at 37-38). Based on the present record, however, the Court cannot ascertain whether Anderson calculated Action Nissan's lost profits or is merely using the term of art "lost profits" as a veil to hide an impermissible result. As a result, the Court will hear additional evidence and argument on this issue at the Pretrial Conference.

Finally, Mr. Anderson also opines that Ford's turndown departed from industry standards. Ford moves to exclude this testimony because (1) it is based on pure *ipse dixit*, (2) it is not a "standard" at all, but a disagreement with how Ford applied its criteria, and (3) it inappropriately invades the province of the jury. (Doc. 257 at 9-10). Plaintiff responds by citing to the various bases for that opinion, including Mr. Anderson's own experience. (Doc. 275 at 10-11). Considering the Court will take the Anderson Motions under advisement, it will decline to rule on this issue prior to the Pretrial Conference.

**III. Sharif Farhat (Defendants' Expert)**

Plaintiff moves to exclude four opinions offered by Defendants' expert Sharif Farhat. (Doc. 260). First, Plaintiff challenge's Farhat's opinion that Action Nissan's poor sales performance during the relevant period was not the result of its reduced allocation of Hyundai vehicles. (*See* Doc. 260 at 8). While Farhat conceded in his

deposition that the allocation restriction is "a plausible explanation" for Action Nissan's reduced sales, Plaintiff argues that he does not account for the reduced allocation in his ultimate opinion. (*Id.*). Hyundai responds that "Mr. Farhat does directly consider allocation." (Doc. 272 at 4 (citing Farhat Rpt., Doc. 202-1 at 18)). According to Hyundai, Mr. Farhat rules out allocation as a major factor based on his experience and on comparisons with other dealers in the state and local market. In any event, an expert need not rule out all possible alternatives, so long as he can explain why other conceivable causes are excludable. *See Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010). Mr. Farhat does exactly that here.

Plaintiff next contests Farhat's opinion that Action Nissan's lost discretionary allocation from Hyundai does not explain its poor Sales Efficiency Score. (Doc. 260 at 9-10). Plaintiff argues that Mr. Farhat's sole basis for this opinion is his reliance on the opinion of another defense expert (Joseph Gardemal) that Action Nissan's under-allocation was "fewer than 200 vehicles." (*Id.*). Plaintiff avers that this conclusion, in turn, was based upon Gardemal's "estimation" of the result of the Allocation Case. (*Id.*) Plaintiff's argument here, however, is actually a collateral attack on Gardemal's opinion, which the Court will address below. Plaintiff's Motion is denied with respect to its first two arguments.

Plaintiff's last argument is that Mr. Farhat inappropriately invades the province of the jury by opining that Ford's rejection of Action Nissan's purchase was reasonable and that sales efficiency measures a transferee's "business experience" under Fla. Stat. § 320.643(1)(a)(2). Hyundai responds that Farhat "provides a detailed, data-driven

analysis, supported by statistical comparisons and empirical observations, and his 40 years of industry experience, explaining why sales efficiency is a reasonable and widely used measure of dealer performance in the automotive industry." (Doc. 272 at 11). He never opines, according to Ford, "that Sales Efficiency constitutes 'business experience' within the meaning of § 320.643(1)(a), nor does he conclude that Ford's rejection satisfied that statute." (Doc. 283 at 7).

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "An expert may not, however, merely tell the jury what result to reach" or "testify to the legal implications of conduct." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). But an expert may testify "as to standard practices in an industry when it is relevant and the expert has demonstrated a basis for the opinion." *Go Mobile Flooring, LLC v. Blue Banyan Sols., Inc.*, 663 F. Supp. 3d 1294, 1314–15 (M.D. Fla. 2023) (collecting cases).

The statute at issue in this case requires Ford to prove that its turndown was reasonable and that Action Nissan failed to meet its "written, reasonable, and uniformly applied standards or qualifications" that relate to the "financial qualifications . . . and business experience of [Action Nissan] or [its] executive management." Fla. Stat. § 320.643(1)(a). Whether Ford's decision was "reasonable" and whether its standards related to the "business experience" of Action Nissan are questions of fact for the jury. For their parts, Ford and Hyundai claim that Farhat's testimony will not improperly invade these decisions. Consequently, Plaintiff's

Motion to Exclude the Testimony of Defendants' Expert Sharif Farhat will be denied without prejudice to Action Nissan's timely objection at trial.

**IV. David Smith and Joseph Gardemal III (Defendants' Experts)**

Defense experts David Smith and Joseph Gardemal III are economists who plan to offer opinions relating to Plaintiff's damages and the reasonableness of the sales efficiency metric. Plaintiff moves to exclude their testimony on three separate grounds. First, Plaintiff challenges the opinions of both experts that Action Nissan suffered no damages as a result of Ford's turndown because the economists rely on a "fair market value" calculation which this Court already ruled was inapposite. (Doc. 261 at 7-8). Defendants point to Mr. Anderson's opinion regarding market value, discussed above, and argue that Smith and Gardemal are merely responding to that opinion. (Doc. 273 at 5; Doc. 284 at 3). This dispute appears to largely be a mistake of language—not a basis to exclude the testimony of these experts. As discussed above, lost profits and market value are not mutually exclusive concepts. As a result, the Court will take this issue under advisement.

Plaintiff's second argument is that the Court should exclude Gardemal's estimate of the number of vehicles that were withheld by Hyundai because the estimate is based on pure speculation regarding what the jury in the Allocation Case decided. (Doc. 261 at 9). Defendants respond that Gardemal relied on "publicly available information from the prior trial between Plaintiff and Hyundai and used that information to calculate the estimated number of lost sales based on the jury's verdict."

(Docs. 273 at 8-9; 284 at 6-8). The Court agrees with the Defendants; therefore, Plaintiff's Motion is denied.

Finally, Plaintiff challenges Smith's opinion that Ford's rejection was "reasonable" under Fla. Stat. § 320.643(6). Defendants disagree with this characterization of Smith's opinion. According to Hyundai, "[h]e offers an economist's view of whether the metrics Ford used are a rational economic basis for evaluating a prospective dealer—precisely the opinion Plaintiff concedes is admissible." (Doc. 273 at 10); (*see also* Doc. 284 at 8-9). Considering that the Parties' filings contain mutually self-serving cherry-picked citations to Smith's testimony, it is difficult for the Court to determine what Smith may or may not say on this issue. As such, the Motion will be denied without prejudice to Action Nissan's timely objection at trial.

## CONCLUSION

Accordingly, it is hereby **ORDERED** as follows:

1. Defendants' Motions to Exclude the Testimony of Plaintiff's Expert Edward M. Stockton (Docs. 255 and 262) are **TAKEN UNDER ADVISEMENT**. The Parties should be prepared to address the issues discussed above at the Pretrial Conference. **Plaintiff shall ensure that Mr. Stockton is available to testify, either in person or remotely, at that hearing.**

2. Defendants' Motions to Exclude the Testimony of Plaintiff's Expert Patrick L. Anderson (Docs. 256 and 257) are **GRANTED in part and TAKEN**

**UNDER ADVISEMENT in part**, as described above. The Court will hear additional argument and evidence at the Pretrial Conference. **Plaintiff shall ensure that Mr. Anderson is available to testify, either in person or remotely, at that hearing.**

3. Plaintiff's Motion to Exclude the Testimony of Defendants' Expert Sharif Farhat (Doc. 260) is **DENIED in part and DENIED without prejudice in part** to Plaintiff's timely objection at trial, as discussed above.

4. Plaintiff's Motion to Exclude the Testimony of Defendants' Experts David Smith and Joseph Gardemal III (Doc. 261) is **TAKEN UNDER ADVISEMENT in part, DENIED in part, and DENIED without prejudice in part** to Plaintiff's timely objection at trial, as discussed above.

**DONE** and **ORDERED** in Orlando, Florida on November 10, 2026.

NATHAN W. HILL
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record